**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| EDWARD PATRICK RYAN JR. and TAMMY LYNN RYAN, individually and as husband and wife, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No.: 1:26-cv-3 |
| LIBERTY MUTUAL INSURANCE COMPANY and LIBERTY INSURANCE CORPORATION; | * | Judge: Kleeh |
| CCC INTELLIGENT SOLUTIONS INC.; | * | ELECTRONICALLY FILED 1/06/2026 U.S. DISTRICT COURT Northern District of WV |
| BODYSHOPBIDS, INC., d/b/a SNAPSHEET, INC.; | * | |
| ALLCAT CLAIMS SERVICE, LP; | * | |
| CLAIM ASSIST SOLUTIONS and CLAIM ASSIST TECHNOLOGIES LLC, | * | |
| Defendants. | * | |

**COMPLAINT**

**NOW COME** your plaintiffs, Edward Patrick Ryan, Jr. and Tammy Lynn Ryan, individually and as husband and wife, by and through their undersigned counsel and for their Complaint against defendants Liberty Mutual Insurance Company and Liberty Insurance Corporation, CCC Intelligent Solutions, Inc., Bodyshopbids, Inc. d/b/a Snapsheet, Inc., Allcat Claims Service, LP, Claim Assist Solutions, and Claim Assist Technologies, LLC, state as follows.

**PARTIES**

1. Plaintiff Edward Patrick Ryan Jr. is, and at all times relevant herein was, a resident and citizen of Monongalia County, West Virginia, residing in Morgantown, West Virginia.

2. Plaintiff Tammy Lynn Ryan is, and at all times relevant herein was, a resident and citizen of Monongalia County, West Virginia, residing in Morgantown, West Virginia. She is the spouse of Edward Patrick Ryan Jr.

3. Plaintiffs are insureds under homeowners and automobile insurance policies issued by Liberty Mutual Insurance Company and/or Liberty Insurance Corporation.

4. Defendant Liberty Mutual Insurance Company and/or Liberty Insurance Corporation ("Liberty Mutual") is a stock insurance company incorporated under the laws of Massachusetts with its principal place of business at 175 Berkeley Street, Boston, Massachusetts 02116. At all relevant times, Liberty Mutual was authorized to transact insurance business in the State of West Virginia by the West Virginia Offices of the Insurance Commissioner and provided homeowners and automobile insurance coverage to West Virginia consumers, including Plaintiffs.

5. Defendant CCC Intelligent Solutions Inc. ("CCC") is a corporation that markets, sells, and provides vehicle valuation products and services—including total loss valuation reports—to insurers, including Liberty Mutual. At all times relevant, CCC acted as an agent, co-venturer, and/or joint participant with Liberty Mutual in the valuation and adjustment of Plaintiffs' automobile claims.

6. Defendant Bodyshopbids, Inc. d/b/a Snapsheet, Inc. ("Snapsheet") is a Delaware corporation with its principal place of business in Illinois. At all relevant times, Snapsheet provided virtual appraisal and claims software services to Liberty Mutual designed to reduce claim payments. Snapsheet's marketing materials tout that their system results in "15-20% Indemnity Savings" on average for insurance carriers.

7. Defendant Allcat Claims Service, LP ("Allcat") is a claims adjusting service with business addresses in Texas, Florida, and California. Allcat is licensed in California (License #2F05623)

and Florida (License #G198537). At all times relevant, Allcat provided claims adjusting services to Liberty Mutual for Plaintiffs' homeowners claim and acted as an agent and/or co-venturer with Liberty Mutual.

8. Defendants Claim Assist Solutions and Claim Assist Technologies, LLC (collectively "Claim Assist") provide AI-driven claims management platform services to insurance carriers. Claim Assist is led by CEO Basker Rayasam and is backed by investors Trive Capital and Valedor Partners. Claim Assist claims to service six out of the top ten property and casualty insurance carriers and operates through a network of more than 2,000 employees and 17,000 contractors. At all times relevant, Claim Assist provided technology and claims processing services to Liberty Mutual and acted as an agent and/or co-venturer with Liberty Mutual in connection with Plaintiffs' claims.

## JURISDICTION AND VENUE

9. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332 in that the amount in controversy exceeds $75,000.00, exclusive of costs and interest, and involves citizens of different states.

10. Defendants availed themselves to the jurisdiction of this Court pursuant to W. Va. Code § 56-3-33 by doing, personally and through their agents, the following acts:

a. Transacting insurance business in West Virginia and issuing homeowners and automobile insurance policies to West Virginia residents, including Plaintiffs;

b. Committing tortious acts within this state by engaging in breach of contract, common law bad faith, violation of West Virginia Unfair Trade Practices Act, civil conspiracy, fraud/fraudulent misrepresentation, unjust enrichment, and/or negligence/negligent misrepresentation;

c. Causing injuries to persons in West Virginia, including Plaintiffs Edward Patrick Ryan Jr. and Tammy Lynn Ryan;

d. Deriving substantial revenues from insurance business and claims-related services in West Virginia; and

e. Engaging in claims adjustment, loss valuation, and related activities directed to and affecting West Virginia policyholders.

11. Venue is proper pursuant to 28 U.S.C. § 1391(a) as a substantial portion of the events giving rise to the claims herein took place in Monongalia County, West Virginia, which is within the judicial district of this Court, because Plaintiffs reside here, the insured property is located in Morgantown, West Virginia, the loss occurred here on April 19, 2025, and Defendants conduct business here. All relevant claims handling, investigations, and communications occurred in or were directed to West Virginia.

## III. FACTUAL ALLEGATIONS

### A. The Insurance Policies and Covered Loss

12. At all relevant times, Liberty Mutual was an insurer duly authorized to transact insurance business in the State of West Virginia and subject to West Virginia insurance laws and regulations, including the West Virginia Unfair Trade Practices Act, W. Va. Code § 33-11-1, et seq., and West Virginia Insurance Regulations, including Series 14.

13. Liberty Mutual issued to Plaintiffs a homeowners insurance policy, Policy No. H37-281-587442-7048, LibertyGuard® Deluxe Homeowners Policy, with a policy period from August 22, 2024, through August 22, 2025, with an annual premium of $2,760.10 and a deductible of $1,000.

14. The homeowners policy provided the following coverage limits: Coverage A (Dwelling with Expanded Replacement Cost) - $750,100; Coverage B (Other Structures) - $75,010; Coverage C (Personal Property with Replacement Cost) - $562,580; Coverage D (Loss of Use) - Actual Loss Sustained; Coverage E (Personal Liability) - $300,000 per occurrence; and Coverage F (Medical Payments to Others) - $1,000 per person.

15. Liberty Mutual also issued to Plaintiffs an automobile insurance policy, Policy No. AOV-281-737768-70 4 5, covering multiple vehicles owned by Plaintiffs, including collision and comprehensive coverage with $1,000 deductibles.

16. On April 19, 2025, at approximately 8:15 p.m., a severe weather event—specifically, a tornado and/or fast-moving microburst with winds gusting up to 70 mph—struck the Morgantown, West Virginia area, causing substantial damage to Plaintiffs' residence and to multiple vehicles owned by Plaintiffs.

17. The severe weather event caused extensive damage to Plaintiffs' home.

18. Damage to the plaintiff's home included, but was not necessarily limited to, the following:

a. west-facing and rear roof shingles and plywood completely ripped from the structure;

b. east-facing roof shingles loose, missing, and damaged; fascia and soffit damage;

c. extensive water damage to the master bedroom, closet, and bathroom;

d. water damage to a large bonus bedroom, closet, and bathroom;

e. water damage to the kitchen, kitchen bump-out, great room, and basement; and

f. electrical system damage including malfunctioning GFI outlets, inoperable alarm system, and inoperable garage door opener system.

19. The severe weather event also caused damage to Plaintiffs' personal property, including but not limited to:

a. gas fireplace;

b. large-screen television;

c. sound system, projector;

d. outdoor patio furniture;

e. patio umbrella;

f. grill;

g. carpeting;

h. garage door opener;

i. garage door keypad

j. appliances; and

k. food spoilage.

20. The same severe weather event caused damage to five vehicles insured under Plaintiffs' automobile policy:

a. 2007 Chevrolet Silverado (VIN: 1GCHK29KX7E595479);
b. 2014 Fiat 500L (VIN: ZFBCFABH1EZ025922);
c. 2018 GMC Terrain (VIN: 3GKALXEX5JL144789);
d. 2018 Chevrolet Traverse (VIN: 1GNEVFKW2JJ121109); and
e. 2019 Cadillac Escalade (VIN: 1GYS4BKJ4KR154623).

21. Plaintiffs timely reported the losses to Liberty Mutual on April 19, 2025.

22. Plaintiffs at all times complied with all material duties and requirements under the homeowners insurance policy.

23. Plaintiffs took immediate steps to mitigate further damage by placing tarps on the roof, using buckets to catch water, deploying industrial dehumidifiers, and hiring emergency mitigation services.

24. Plaintiffs at all times complied with all material duties and requirements under their automobile insurance policy.

25. Liberty Mutual acknowledged that the losses to Plaintiffs' home and vehicles were covered under the applicable insurance policies and assigned claim numbers for the homeowners claim (Claim No. 059203525-01) and for each of the automobile claims (Claim Nos. 059211416-01, 059212781-01, 059217365-01, 059217096-01, and 059217318-03).

**B. Liberty Mutual's Use of Third-Party Vendors to Reduce Claims Payment**

26. Liberty Mutual did not independently investigate, evaluate, or adjust Plaintiffs' claims.

27. Instead, Liberty Mutual systematically outsourced critical claims functions to third-party vendors whose business model and contractual relationships depend on reducing claim payments to maximize insurance company profits.

28. Liberty Mutual engaged in business relationships with multiple vendor defendants for the purpose of processing Plaintiffs' claims, including: Allcat Claims Service, LP; Claim Assist Solutions and Claim Assist Technologies, LLC; Bodyshopbids, Inc. d/b/a Snapsheet, Inc.; and CCC Intelligent Solutions Inc.

29. These vendor defendants are not neutral, independent adjusters. Rather, they are knowing and willing participants in Liberty Mutual's systematic scheme to undervalue and underpay first-party insurance claims.

30. The vendor defendants design, provide, and implement software tools, valuation methodologies, and claims processing platforms specifically calibrated to reduce Liberty Mutual's indemnity payments at Plaintiffs' expense.

31. Snapsheet is a technology company that provides virtual appraisal and estimating services to insurance carriers.

32. Snapsheet markets its services by explicitly promising insurance companies that its system will reduce claim payments.

33. Snapsheet's promotional materials tout that their system results in 15-20% savings on average.

37. Liberty Mutual, as a general business practice, contracts with Snapsheet to generate lowball automobile property estimates.

38. These estimates are based exclusively on photographs and are made without Liberty Mutual or Snapsheet conducting any physical inspection of the insured's vehicles.

39. To make matters worse, Snapsheet trains its estimators to not "mention poor photo quality" in the estimates. This deliberate omission conceals the limitations and inaccuracies inherent in photo-based estimating.

40. Liberty Mutual and Snapsheet's business arrangement was designed to reduce Liberty Mutual's indemnity payments.

41. This predetermined reduction target bears no relationship to the actual value of damage or loss, but rather reflects a profit-driven mandate to systematically underpay claims regardless of the true extent of covered losses.

42. Snapsheet's photo-based estimating methodology is incapable of detecting or valuing damage that is invisible to the naked eye.

43. Snapsheet's photo-based estimating methodology is incapable of detecting or valuing damage to the following:

a. component parts;
b. frame damage;
c. malalignment, and
d. other structural or mechanical issues that require physical inspection to identify and properly estimate.

44. Liberty Mutual utilized Snapsheet's virtual appraisal services to evaluate multiple vehicles in Plaintiffs' claims.

45. Liberty Mutual utilized Snapsheet's virtual appraisal services to evaluate multiple vehicles in Plaintiffs' claims despite knowing that photo-based estimates systematically undervalue actual repair costs and total loss values.

46. CCC Intelligent Solutions Inc. engages in a comparable scheme with Liberty Mutual to unfairly and improperly reduce their indemnity losses to the insured's detriment.

47. CCC provides vehicle valuation software and services, including the CCC ONE Market Valuation Report system, to insurance carriers.

48. CCC generates Market Valuation Reports that purport to represent objective, accurate measures of actual cash value for total loss vehicles.

49. CCC’s Market Valuation Reports are not independent or neutral.

50. CCC's valuation methodology is designed and customized to produce systematically reduced valuations that benefit insurance carriers.

51. Liberty Mutual utilized CCC valuation reports for Plaintiffs' total loss vehicle claims, including the 2014 Fiat 500L, the 2018 GMC Terrain, and the 2018 Chevrolet Traverse.

52. Each CCC report was generated based on information and parameters provided by Liberty Mutual, not based on independent market analysis.

53. The CCC reports explicitly state that they reflect "CCC Intelligent Solutions Inc.'s opinion as to the value of the loss vehicle, based on information provided to CCC by LIBERTY MUTUAL PERSONAL INSURANCE COMPANY" and that "no other person or entity is entitled to or should rely upon this Market Valuation Report."

54. CCC's disclaimer acknowledges that CCC’s Market Valuation Reports are not independent market assessments but rather predetermined outputs based on Liberty Mutual's inputs.

55. Allcat Claims Service, LP, plays a central role in Liberty Mutual's claims processing operations.

56. Allcat is part of the Claim Assist Solutions family of companies, which collectively provide people, process, and technology to insurance carriers in the auto, property, flood, and the complex and commercial claims industry.

57. Allcat was involved in adjusting Plaintiffs' homeowners claim. Liberty Mutual assigned adjusters including Shermica J. Porter and Daniel Scott Weakly, both affiliated with Allcat Claims Service, to inspect and estimate Plaintiffs' property damage.

58. Claim Assist Solutions and Claim Assist Technologies, LLC operate an AI-driven claims assignment and processing platform that integrates with popular estimation software, including

Xactimate. This proprietary technology platform automates claims processing, implements automated quality review, and enables systematic control over claim outcomes.

59. Claim Assist's platform uses intelligent workload distribution that enables carriers to filter and assign adjusters by experience, location, and service ratings. The system employs a scoring mechanism to rate adjusters "based on the number of claims handled for an insurance company," and clients can "request adjusters with preferred scores to meet their goals."

60. This scoring system creates powerful financial incentives for adjusters to process claims quickly and with minimal payouts in order to maintain high scores and continue receiving claim assignments.

61. Adjusters who advocate too strongly for insureds or who write estimates that are "too high" risk lower scores and reduced work assignments.

62. Claim Assist Solutions services six out of the top ten property and casualty insurance carriers in the United States.

63. The company operates through a network of more than 2,000 employees and approximately 17,000 licensed independent contractors.

64. Claim Assist's business model is explicitly focused on reducing costs for insurance carriers. The company advertises a "market-differentiated pricing model" that emphasizes cost reduction for carriers and promises to demonstrate the value of our claims team and the cost per claim savings.

65. Claim Assist's promotional materials state that the company provides "valuable capacity back to the carrier" through "high-quality claims handling" and a pricing model designed to deliver "cost per claim savings" to insurance companies.

66. This cost-reduction mandate necessarily comes at the expense of policyholders who receive reduced claim payments.

67. The operational structure of Liberty Mutual's vendor relationships reveals a coordinated scheme to systematically undervalue claims.

68. When Plaintiffs' claims were reported, Liberty Mutual routed them to these third-party vendors for "inspection," "estimation," or "adjustment," but the true purpose was systematic undervaluation through predetermined processes designed to reduce claim payments.

69. The financial incentive alignment between Liberty Mutual and its vendor defendants creates an inherent conflict of interest.

70. The vendors profit from helping Liberty Mutual underpay claims through volume-based contracts, performance metrics tied to cost reduction, and ongoing business relationships that depend on delivering the cost savings promised in their marketing materials.

71. This is not a case of isolated claim handling errors or individual adjuster mistakes. Rather, Liberty Mutual has adopted a general business practice of utilizing third-party vendors whose business models, contractual arrangements, technologies, and financial incentives are all specifically designed to reduce claim payments below the amounts actually owed under insurance policies.

72. Liberty Mutual's use of these vendors affects consumers beyond Plaintiffs. The same valuation methodologies, software platforms, estimating procedures, and financial incentive structures are applied to thousands of West Virginia policyholders and hundreds of thousands of policyholders nationwide.

73. The systematic nature of Liberty Mutual's practices is further evidenced by the company's refusal to provide Plaintiffs with copies of estimates, audits, and photographs relied upon by independent adjusters, claiming such information was "proprietary."

74. This concealment prevents insureds from understanding how their claims were valued and from effectively challenging systematic undervaluation.

75. Liberty Mutual's outsourcing of claims functions to vendor defendants who promise indemnity savings represents an abdication of the insurer's duty to its insureds and a deliberate strategy to increase corporate profits by systematically underpaying covered losses.

**C. The Homeowners Claim - Property Damage and Initial Response**

76. Liberty Mutual assigned the homeowners claim on April 23, 2025, four days after the April 19, 2025 loss. The claim was assigned Claim Number 059203525-01.

77. Liberty Mutual first contacted Plaintiffs regarding their homeowners claim on April 26, 2025.

78. Liberty Mutual did not conduct its own inspection or prepare its own estimate of the covered damages.

79. Instead, Liberty Mutual assigned the inspection and estimation functions to contracted adjuster Shawn Patrick McKnight, operating through Allcat Claims Service, LP.

80. McKnight is a self-employed contract adjuster based in Butler, Pennsylvania, who has been licensed as an adjuster since 2004.

81. McKnight inspected Plaintiffs' property on April 28, 2025.

82. During the inspection, McKnight represented to Plaintiffs that a full roof replacement was warranted based on the extent of the wind damage to the roofing system.

83. McKnight's representations created a reasonable expectation that Liberty Mutual would provide coverage sufficient to replace the damaged roof and repair all related structural and water damage throughout the residence.

84. Rather than conducting an independent, thorough assessment of the covered damages, Liberty Mutual and its vendor adjusters utilized the Cotality Data Driven pricing database and ITEL programs to generate an estimate based on predetermined pricing formulas rather than the actual scope of work required to restore Plaintiffs' home to its pre-loss condition.

85. The water intrusion caused ongoing damage and created moisture issues requiring immediate professional mitigation services.

86. Plaintiffs had hired Build With MD to perform emergency water mitigation services, which were completed on May 6, 2025, at a cost of $12,733.19.

87. On May 6, 2025, Liberty Mutual completed an estimate totaling only $24,304.44 in Replacement Cost Value. The estimate breakdown is as follows:

a. Subtotal (Materials, Labor, Equipment): $22,928.68;
b. State Tax (6%): $1,375.76;
c. Replacement Cost Value: $24,304.44;
d. Less Debris Removal (Paid When Incurred): $(910.23);
e. Net Actual Cash Value: $23,394.21;
f. Less Deductible: $(1,000.00);
g. Net Estimate (Check Amount): $22,394.21.

86. After deducting $910.23 for debris removal and applying Plaintiffs' $1,000 deductible, and adding State Tax (6%), Liberty Mutual calculated a net payment of $22,394.21.

87. Liberty Mutual’s estimate was facially inadequate given the scope of structural damage, extensive water damage to multiple rooms throughout the residence, and the representations made by McKnight during his inspection that a full roof replacement was necessary.

88. On May 7, 2025, Liberty Mutual issued a check in the amount of $22,394.21 to Plaintiffs.

89. Recognizing that the payment was grossly inadequate to repair the extensive damage to their home, Plaintiffs refused to cash the check.

90. The inadequacy of Liberty Mutual's offer was readily apparent from even a cursory review of the damage.

91. The April 19, 2025 tornado had ripped roof shingles and plywood completely off the west-facing and rear portions of the structure, damaged the east-facing roof sections, and caused extensive water intrusion throughout the home affecting the master bedroom, master bathroom and closet, a large bonus bedroom and bathroom, the kitchen and kitchen bump-out, the great room, and the basement.

92. Despite the obvious inadequacy of its initial estimate and Plaintiffs' refusal to accept the settlement offer, Liberty Mutual offered only an additional $2,300.00 as a "supplemental settlement." Liberty Mutual’s estimate remained grossly inadequate to repair the home. This sum the was simply the amount the Ryans paid to tarp their roof.

93. Recognizing that Liberty Mutual was systematically undervaluing their claim, Plaintiffs engaged counsel.

94. On June 16, 2025, Plaintiffs retained legal counsel and sent a letter of representation to Liberty Mutual demanding proper payment of their homeowners claim, provision of all estimates and documentation, and explanation of Liberty Mutual's valuation methodology.

95. Thereafter plaintiff, by and through counsel, retained the expert services of Stephen Hnat & Associates, a licensed public adjuster with extensive experience in property damage claims and multiple industry certifications, including certifications from the International Association of United Adjusters as a Certified Property Insurance Appraiser and Umpire.

96. Stephen Hnat personally inspected Plaintiffs' property and conducted a comprehensive, room-by-room and system-by-system assessment of all damage. Hnat's evaluation included detailed measurements, photographic documentation, and itemized repair specifications based on proper industry standards.

97. On July 24, 2025, Stephen Hnat & Associates provided a detailed estimate calculating the Replacement Cost Value at $141,043.59. This estimate was later updated on July 28, 2025, to $160,126.17 to reflect additional identified damages.

98. The disparity between Liberty Mutual's lowball estimate and Stephen Hnat's comprehensive estimate of $160,126.17 is substantial.

99. Stephen Hnat's estimate revealed numerous critical deficiencies in Liberty Mutual's valuation, including:

a. failure to account for complex finish carpentry work;

b. omission of specialized electrical system repairs;

c. failure to include kitchen French doors that were damaged;

d. omission of basement doors requiring replacement; failure to account for HVAC registers damaged by water intrusion;

e. omission of home automation systems affected by electrical and water damage;

f. inadequate calculations for overhead and profit that did not reflect the complexity and multiplicity of trades involved in the restoration;

g. failure to properly account for recoverable depreciation under the replacement cost coverage; and

h. complete omission of building code upgrade costs required for lawful completion of the repairs.

100. Liberty Mutual's estimate utilized generic pricing from the Cotality database and ITEL programs rather than conducting a proper assessment of the specific materials, finishes, and systems in Plaintiffs' home that required repair or replacement.

101. When Plaintiffs requested copies of the underlying data, photographs, and detailed estimates from McKnight and other adjusters who had evaluated the property, Liberty Mutual refused to provide these materials, claiming they were "proprietary" in nature.

102. This refusal to disclose the basis for Liberty Mutual's valuation prevented Plaintiffs from understanding how their claim had been evaluated and from effectively challenging the systematic undervaluation.

103. Liberty Mutual failed to substantively respond to the pertinent communications contained in the June 16, 2025, letter of representation.

104. Despite multiple subsequent letters dated July 11, 2025, July 15, 2025, July 24, 2025, July 25, 2025, and September 7, 2025, Liberty Mutual continued to refuse to provide the requested documentation, failed to provide any substantive response to counsel's demands, and maintained its inadequate settlement offer while the Ryans' home remained unrepaired months after the covered loss.

**D. The Homeowners Claim - Personal Property Losses and Liberty Mutual's Failure to Investigate**

105. In addition to the structural damage to their home, Plaintiffs suffered substantial personal property losses as a direct result of the April 19, 2025 tornado and subsequent water intrusion.

106. Plaintiffs provided Liberty Mutual with a detailed inventory of damaged and destroyed personal property, including high-value items: a gas fireplace; an LG 65-inch smart television; a Samsung sound bar and theatre sound system; an Epson theatre projector; a Liftmaster garage door opener and entry access pad; a Guardian home alarm system; a Legrand home sound system; makeup vanity with lights; iron patio furniture (table and chairs); plastic patio lounge chairs; an outdoor grill; multiple GFI electrical outlets; can lights; bathroom and bedroom light fixtures; bathroom ventilation fans; smoke detectors; breakfast bump-out room carpeting; outdoor patio

carpeting; and substantial food loss from two refrigerators/freezers that lost power during the extended power outage following the storm.

107. The documented personal property losses totaled at least $3,957.81, with additional high-value items including the gas fireplace (valued at $6,027.07) and the Epson projector (valued at $1,199.99).

108. Despite Coverage C of Plaintiffs' homeowners policy providing $562,580 in coverage for personal property losses, Liberty Mutual has made no effort whatsoever to investigate, evaluate, adjust, or make any offer of payment on the personal property component of Plaintiffs' claim.

109. Liberty Mutual's complete failure to investigate the personal property claim violates the insurer's fundamental duty to conduct a thorough and objective investigation of all aspects of a covered claim and constitutes a per se breach of Liberty Mutual's duty of good faith and fair dealing.

110. Liberty Mutual has never requested additional documentation, photographs, receipts, or any other information regarding Plaintiffs' personal property losses, demonstrating a complete absence of any investigation whatsoever.

111. The personal property claim remains entirely unpaid and unresolved. Plaintiffs remain uncompensated for essential household items, furnishings, appliances, and systems that were damaged or destroyed in the covered loss.

112. Liberty Mutual's abandonment of its duty to investigate and adjust the personal property losses constitutes a separate and independent basis for bad faith, distinct from the systematic undervaluation of the structural damage to Plaintiffs' home.

. . .

. . .

**E. The Automobile Claims - Use of Snapsheet and Systematic Undervaluation**

113. On the same date as the homeowners loss, April 19, 2025, Plaintiffs suffered damage to five separate vehicles insured under their Liberty Mutual automobile policy, Policy No. AOV-281-737768-70 4 5: a 2007 Chevrolet Silverado (VIN: 1GCHK29KX7E595479), assigned Claim No. 059211416-01; a 2014 Fiat 500L (VIN: ZFBCFABH1EZ025922), assigned Claim No. 059212781-01; a 2018 GMC Terrain Denali (VIN: 3GKALXEX5JL144789), assigned Claim No. 059217365-01; a 2018 Chevrolet Traverse (VIN: 1GNEVFKW2JJ121109), assigned Claim No. 059217096-01; and a 2019 Cadillac Escalade (VIN: 1GYS4BKJ4KR154623), assigned Claim No. 059217318-03.

114. All five vehicles sustained substantial damage from the April 19, 2025, tornado, including body damage, glass damage, paint damage, and (as later inspection would reveal) potential frame damage, suspension damage, electrical system damage, and internal component damage not visible to the naked eye.

115. Liberty Mutual did not conduct physical inspections of any of the five damaged vehicles. Instead, Liberty Mutual systematically relied on Snapsheet's virtual appraisal service to generate damage estimates based exclusively on photographs submitted by Plaintiffs, without any physical inspection to identify hidden damage or verify the accuracy of photo-based assessments.

116. This reliance on Snapsheet was not coincidental or based on the particular circumstances of Plaintiffs' claims. Rather, Liberty Mutual has adopted Snapsheet's virtual appraisal system as a general business practice precisely because Snapsheet promises—and delivers—"15-20% Indemnity Savings" on average by systematically underestimating repair costs and vehicle values.

117. Photo-based estimates are inherently deficient for evaluating vehicle damage because photographs cannot capture damage that is not visible to the naked eye, including: frame damage

and structural compromise; suspension system damage and malalignment; electrical system damage to wiring harnesses and control modules; internal mechanical damage to engines, transmissions, and drivetrain components; hidden corrosion and water intrusion; compromised safety system components; and damage to undercarriage components.

118. Despite these well-known limitations, Liberty Mutual made the business decision to use Snapsheet's photo-based estimation system because it reduces claim payments, not because it accurately assesses damage.

119. For the 2007 Chevrolet Silverado (Claim No. 059211416-01), Liberty Mutual utilized Snapsheet to generate a virtual estimate and ultimately paid only $398.56 (after the $1,000 deductible) for repairs to a vehicle that had sustained substantial tornado damage.

120. For the 2019 Cadillac Escalade (Claim No. 059217318-03), Liberty Mutual similarly relied on Snapsheet's virtual estimate and paid only $212.67 (after the $1,000 deductible), despite the vehicle sustaining damage categorized as "Point of Impact: 09 Left T-Bone (Left Side)" from the tornado.

121. For the 2018 GMC Terrain (Claim No. 059217365-01), Liberty Mutual's initial Snapsheet-based estimate was only $483.05. Even after Plaintiffs obtained two supplements (Supplement S01 for $1,997.93 and Supplement S02 for $5,135.50), the cumulative repair estimates totaled only $8,616.48—a figure Liberty Mutual then deemed to exceed the vehicle's value, declaring it a total loss. The Snapsheet software was also used to improperly value the Ryan family's Fiat and Traverse.

122. When Plaintiffs questioned the minimal payments and inadequate estimates, Liberty Mutual repeatedly directed them back to the Snapsheet process, refusing to send qualified adjusters

to conduct physical inspections of the vehicles and refusing to provide the names and contact information of the Snapsheet estimators who had evaluated the photographs.

123. On June 16, 2025, Plaintiffs' counsel sent a letter of representation demanding, among other things: "Please advise the identity of each Snapsheet estimator responsible for analyzing the photographs provided to Liberty Mutual and their contact information"; and "Please promptly provide to us a copy of any document sent or received in this claim. Please include complete copies of all materials sent to you by your Snapsheet's estimators."

124. Liberty Mutual refused to provide this information, claiming the estimates and materials from Snapsheet were proprietary in nature and not subject to disclosure, thereby preventing Plaintiffs from understanding how their claims had been evaluated or from effectively challenging the systematic undervaluation.

125. For three of the five damaged vehicles—the 2014 Fiat 500L, the 2018 GMC Terrain, and the 2018 Chevrolet Traverse—Liberty Mutual determined the vehicles to be total losses and utilized CCC Intelligent Solutions Inc. to generate "Market Valuation Reports" that purported to establish the actual cash value of each vehicle.

126. Liberty Mutual presented these CCC ONE Market Valuation Reports to Plaintiffs as objective, accurate, and fair determinations of what Liberty Mutual owed under the automobile insurance policy for the total loss of each vehicle.

127. In reality, the CCC Market Valuation Reports were not independent, objective assessments. Rather, each CCC report explicitly stated that it reflected "CCC Intelligent Solutions Inc.'s opinion as to the value of the loss vehicle, based on information provided to CCC by LIBERTY MUTUAL PERSONAL INSURANCE COMPANY."

128. The CCC reports further stated that they were "Prepared for LIBERTY MUTUAL PERSONAL INSURANCE COMPANY" and that "no other person or entity is entitled to or should rely upon this Market Valuation Report." This language reveals that CCC's valuations serve Liberty Mutual's interests, not the insureds' interests, and are not intended as neutral market assessments and should not be relied upon by the insureds.

129. CCC's valuation methodology systematically understates actual cash value through multiple mechanisms: (1) manipulation of comparable vehicle selection by using vehicles from distant markets, vehicles with materially different equipment and condition, and vehicles that are not truly comparable; (2) arbitrary condition adjustments that impose excessive deductions for normal wear without measurable, discernible, itemized support; (3) use of artificial "take prices" or assumed negotiation discounts rather than actual market transaction values; and (4) predetermined adjustment formulas and matrices provided by the insurance carrier rather than independent market analysis.

130. For the 2014 Fiat 500L (Claim No. 059212781-01), CCC generated a Market Valuation Report (Report Reference Number 124966676) dated April 23, 2025, establishing a Base Vehicle Value of $7,150.00, applying a Condition Adjustment of -$578.00, and arriving at an Adjusted Vehicle Value of $6,572.00. After taxes and fees, the settlement was $7,042.82, or $6,042.82 after the $1,000 deductible. After paying the lienholder, Plaintiffs would have only received $2,384.53.

131. For the 2018 GMC Terrain (Claim No. 059217365-01), the dramatic undervaluation became even more apparent. Liberty Mutual's total loss determination was made on July 16, 2025, based on a CCC Market Valuation Report (Report Reference Number 126319310) that established a Base Vehicle Value of $19,048.00 with no condition adjustments, resulting in an offer of $19,267.38 after taxes and fees, or $18,267.38 after the deductible.

132. However, Plaintiffs had obtained an independent estimate from PH-Q Pride Honest Quality Inc., a qualified repair facility located at 1851 B Mileground Road, Morgantown, West Virginia, which conducted an actual in-person inspection of the 2018 GMC Terrain at their facility.

133. PH-Q's comprehensive estimate, prepared by estimator Tommy Keener using CCC ONE Estimating software with the MOTOR Crash Estimating Guide, calculated repair costs of $21,497.66 based on 84.4 hours of body labor at $70 per hour, 57.6 hours of paint labor at $70 per hour, and detailed parts pricing using OEM specifications.

134. The disparity between Liberty Mutual's offer of $19,267.38 and the PH-Q repair estimate of $21,497.66 reveals that Liberty Mutual's "total loss" determination was designed to avoid paying the full cost of repairs. Rather than pay $21,497.66 to restore the vehicle, Liberty Mutual declared it a total loss and offered only $19,267.38, creating an underpayment of $2,230.28 while obtaining title to a vehicle that could be repaired and resold.

135. When Plaintiffs provided Liberty Mutual with the PH-Q estimate demonstrating that the repair costs exceeded the CCC valuation, Liberty Mutual's response was to offer Plaintiffs only $1,997.93—with no explanation of how this figure was calculated or what it purported to represent.

136. For the 2018 Chevrolet Traverse (Claim No. 059217096-01), CCC generated a Market Valuation Report (Report Reference Number 125155413) dated May 2, 2025. The CCC report noted that the Traverse had 147,577 miles on the odometer, representing 61% greater than average mileage of 91,800 miles.

137. The CCC report established a Base Vehicle Value of $11,321.00, then applied a Condition Adjustment of -$1,410.00, resulting in an Adjusted Vehicle Value of $9,911.00. After taxes and fees, the settlement was calculated at $10,582.16, or $9,582.16 after the $1,000 deductible.

138. The -$1,410.00 condition adjustment was broken down across multiple vehicle components, with each component receiving a "NORMAL WEAR" rating but nonetheless being assigned negative value impacts: Seats (-$127), Carpets (-$107), Dashboard (-$86), Headliner (-$68), Sheet Metal (-$83), Trim (-$72), Paint (-$107), Glass (-$36), Engine (-$340), Transmission (-$308), Front Tires (-$38), and Rear Tires (-$38).

139. The application of $1,410.00 in condition adjustments for components all rated as "NORMAL WEAR" is arbitrary and excessive. The primary factor affecting the Traverse's value was its high mileage (61% above average), yet CCC and Liberty Mutual imposed substantial additional deductions for normal wear on components that necessarily reflect the vehicle's mileage and age.

140. These condition adjustments were not measurable, discernible, itemized, or specified as required by West Virginia regulations. Rather, they appear to be predetermined reduction factors applied to systematically reduce the valuation regardless of actual condition.

141. When Plaintiffs disputed the Traverse valuation, Liberty Mutual invoked the appraisal clause of the automobile insurance policy, forcing Plaintiffs into an expensive and time-consuming appraisal process rather than simply paying what was owed under the policy.

142. Liberty Mutual's attempt to invoke appraisal on the Traverse claim, after presenting an obviously deficient offer based on CCC's report, represents an improper use of the appraisal process. Rather than conducting a good faith investigation and making a reasonable offer, Liberty Mutual attempted to use the appraisal clause as a delay tactic and a means to force insureds to incur additional expenses and expert fees to obtain benefits that should have been paid promptly in the first instance.

143. CCC Market Valuation Reports systematically undervalued the Plaintiffs' total losses. The systematic pattern of undervaluation across all five vehicle claims demonstrates that Liberty Mutual's practices are not the result of isolated errors or individual claim handling mistakes. Rather, Liberty Mutual has adopted a general business practice of utilizing Snapsheet and CCC vendor partners whose business models, technologies, and contractual arrangements are specifically designed to reduce claim valuations and to systematically underpay automobile claims.

144. The evidence of this systematic pattern includes: (1) exclusive reliance on photo-based Snapsheet estimates without physical inspection for initial damage assessments; (2) minimal initial payments ($212.67 for Escalade, $398.56 for Silverado, $483.00 initial for Terrain) that necessitated supplements and disputes; (3) use of CCC Market Valuation Reports which undervalues total loss vehicles for all three total loss determinations rather than independent appraisals; (4) application of arbitrary condition adjustments and predetermined reduction formulas across multiple vehicles; (5) refusal to provide estimator identities, complete documentation, or transparent explanations of valuation methodologies; and (6) invocation of appraisal and other procedural obstacles when insureds challenged the inadequate offers.

145. Throughout the handling of Plaintiffs' five automobile claims, Liberty Mutual refused to disclose the identities of Snapsheet estimators who had evaluated the photographs, refused to provide complete copies of materials sent by Snapsheet to Liberty Mutual, and refused to provide transparent explanations of how the CCC valuations were calculated or what inputs Liberty Mutual had provided to CCC to generate the predetermined results.

146. This systematic concealment prevented Plaintiffs from understanding how their claims were being processed, from identifying conflicts of interest and improper methodologies, and from

effectively challenging the undervaluations until after retaining legal counsel and conducting independent investigations.

147. The coordination between Liberty Mutual and its vendor partners is further evidenced by Liberty Mutual's ability to engage in post-valuation changes to CCC reports through "POADJ" (post-adjuster) change requests that modified appraiser assignments, condition ratings, and valuation inputs after the initial reports were generated.

148. These post-valuation modifications demonstrate that Liberty Mutual exercises control over the CCC valuation outputs and could manipulate the reported values to achieve predetermined settlement targets, further confirming that the CCC reports are not independent market valuations but rather tools for implementing Liberty Mutual's systematic undervaluation practices.

149. As of the filing of this Complaint, the true value of the damages and losses to the five vehicles substantially based on independent estimates, actual market values, and the cost of comparable replacement vehicles far exceeds the amounts offered by Liberty Mutual to the Plaintiffs in reference to their outstanding claims.

**F. Communications, Concealment, and Direct Violations of Insureds' Rights**

150. Liberty Mutual's systematic undervaluation scheme depends not only on its partnerships with vendor defendants but also on concealing the methodology, inputs, and processes used to generate artificially reduced claim valuations.

151. Throughout the handling of Plaintiffs' claims, Liberty Mutual engaged in a coordinated pattern of concealment, misrepresentation, and improper communications designed to prevent Plaintiffs from understanding and challenging the systematic undervaluation.

152. On June 16, 2025, Plaintiffs retained counsel and sent Liberty Mutual a comprehensive letter of representation demanding: copies of all estimates, audits, and photographs relied upon in

evaluating the claims; identification of each adjuster and estimator responsible for analyzing photographs and their contact information; complete copies of all materials sent by Snapsheet estimators; a certified copy of the insurance policy; explanation of the basis for Liberty Mutual's prior settlement offers; and prompt payment of all benefits owed under the policies.

153. On July 11, 2025, counsel sent a follow-up letter reiterating the demands and emphasizing Liberty Mutual's legal obligations to conduct thorough, objective investigations and to provide transparency in claims handling. Liberty Mutual again failed to provide the requested information.

154. On July 16, 2025, counsel sent a third demand letter, explicitly titled as the "THIRD REQUEST," emphasizing the impropriety of Liberty Mutual's continued silence and refusal to provide basic claim file information. Once again, Liberty Mutual did not provide the requested materials.

155. On July 24, 2025, counsel sent yet another letter addressing both the homeowners claim and the automobile claims, demanding immediate delivery of a certified copy of the insurance policy, detailed explanation of coverages, good faith written justification of settlement offers, copies of all estimates and photographs, and confirmation that Liberty Mutual would adhere to recognized industry standards for first-party claims handling. Liberty Mutual failed to provide any substantive response.

156. Instead of responding to counsel's reasonable requests for information, Liberty Mutual threatened to close Plaintiffs' claims without payment.

157. On July 25, 2025, Liberty Mutual sent an email threatening to close the 2018 Terrain claim for alleged "no communication," despite the fact that counsel had sent multiple detailed letters and was actively attempting to resolve the claim in good faith.

158. Counsel immediately responded on July 25, 2025, pointing out that there was no justification for such a threat given the ongoing efforts to cooperate and resolve the claims, and that Plaintiffs had retained certified public adjuster Robert L. McDorman to assist in reviewing Liberty Mutual's total loss valuation. Counsel emphasized that threatening to close claims without payment violated Liberty Mutual's duty to consider the insured's interests as paramount.

159. On July 29, 2025, counsel sent another letter specifically addressing Liberty Mutual's improper closure of multiple automobile claims despite ongoing correspondence through counsel. The letter demanded that Liberty Mutual reconsider its decision to close the claims and assign all of the Ryan family's claims to a single adjuster and single manager to provide accountability.

160. Throughout this period, despite the retention of counsel and multiple written demands that all communications be directed to Plaintiffs' attorneys, Liberty Mutual continued to contact Plaintiffs directly in deliberate violation of professional conduct rules and with the intent to undermine the attorney-client relationship.

161. On August 1, 2025, Liberty Mutual contacted Plaintiffs directly regarding the uncashed settlement check and other claim matters, circumventing counsel entirely despite having received multiple letters of representation.

162. On September 4, 2025, Liberty Mutual again contacted Plaintiffs directly, continuing its pattern of improper *ex parte* communications with represented parties. These direct contacts were designed to pressure Plaintiffs into accepting inadequate settlement offers without the advice and protection of counsel.

163. On September 11, 2025, a Liberty Mutual adjuster sent Plaintiffs a text message threatening to close the claims for "no communication," despite the extensive documented correspondence between counsel and Liberty Mutual. A screenshot of this text message evidences Liberty Mutual's

bad faith tactics of repeatedly manufacturing false grounds for claim closure while ignoring legitimate communications from Plaintiffs' attorneys.

164. Liberty Mutual's refusal to respond to counsel's demands was not mere negligence or administrative oversight. Rather, Liberty Mutual strategically refused to provide the requested information because disclosure would reveal the systematic nature of the undervaluation scheme and the improper methodologies employed by Liberty Mutual and its vendor partners.

165. Throughout the claims process, Liberty Mutual repeatedly claimed that estimates, audits, photographs, and adjustment methodologies were "proprietary" in nature and could not be disclosed to Plaintiffs. This blanket assertion of proprietary confidentiality was used to withhold critical claim file information that Plaintiffs had every right to review and evaluate.

166. West Virginia Code § 33-11-4(9)(n) requires insurers to provide reasonable explanations of the basis in the insurance policy, in relation to the facts or applicable law, for denial of a claim or compromise settlement offer. Liberty Mutual's concealment of its valuation methodologies violates Plaintiffs' fundamental right under West Virginia law to understand the basis upon which their insurance claims were valued and to meaningfully challenge improper valuations.

167. The information Liberty Mutual refused to provide includes: the identities and contact information for Snapsheet estimators who analyzed photographs of Plaintiffs' vehicles; complete copies of materials sent by Snapsheet to Liberty Mutual; complete copies of estimates, audits, and photographs from independent adjusters including Shawn McKnight and Allcat personnel; documentation of the Cotality Data Driven pricing database and ITEL programs used for the homeowners estimate; and documentation of the CCC ONE valuation parameters, comparable vehicle selection criteria, and condition adjustment matrices used for the automobile total loss valuations.

168. Liberty Mutual's concealment extends beyond mere refusal to produce documents. Liberty Mutual actively concealed the existence of customized valuation matrices, adjustment factors, and pricing databases that are accessible only to Liberty Mutual and its vendors but are not available to independent appraisers or experts retained by insureds.

169. For example, the CCC ONE Market Valuation Reports used for Plaintiffs' total loss vehicles explicitly state that they are "Prepared for LIBERTY MUTUAL PERSONAL INSURANCE COMPANY" and that "no other person or entity is entitled to or should rely upon this Market Valuation Report." This reveals that the valuation tools used by Liberty Mutual provide information and analytical capabilities available only to the insurer, creating an inherently unfair and asymmetric claims process.

170. This information asymmetry creates an unlevel playing field where insureds cannot fairly evaluate or effectively dispute valuations. Plaintiffs were forced to hire independent experts and public adjusters at substantial expense simply to obtain basic information about market values and repair costs—information that Liberty Mutual possessed all along but refused to share.

171. Liberty Mutual's field adjuster Shawn McKnight represented to Plaintiffs during his April 28, 2025, inspection of their home that a full roof replacement was warranted and necessary. McKnight told Plaintiffs and their contractor that he would finalize the report with photographs and submit it to Liberty Mutual, confirming that full roof replacement had been approved. Yet Liberty Mutual's subsequent estimate made no provision for full roof replacement, revealing that McKnight's representations, whether unauthorized or deliberately misleading, created false expectations that Liberty Mutual then failed to honor.

172. Liberty Mutual’s own adjusters state they "do not have access" to critical information necessary to properly evaluate claims. This admission demonstrates the systematic nature of the

information asymmetry: even Liberty Mutual's own employees lack access to the proprietary tools and methodologies controlled by vendor partners, confirming that the valuation process is opaque, unaccountable, and designed to prevent meaningful scrutiny.

173. Liberty Mutual's premature claim closure attempts and threats to close claims for "no communication" constitute bad faith pressure tactics designed to coerce Plaintiffs into accepting inadequate settlement offers. By manufacturing false grounds for claim closure while simultaneously ignoring legitimate communications from counsel, Liberty Mutual sought to create artificial urgency and leverage to force settlement on Liberty Mutual's terms.

174. Liberty Mutual's pattern of concealment, misrepresentation, improper *ex parte* communications, and threats of claim closure are not unique to Plaintiffs' claims. Rather, these tactics are part of Liberty Mutual's general business practice of preventing insureds from understanding and challenging the systematic undervaluation scheme, thereby maximizing Liberty Mutual's profits at policyholders' expense.

**G. Violations of West Virginia Insurance Law and Regulations**

175. West Virginia law establishes comprehensive statutory and regulatory standards governing insurance claims handling to protect consumers from unfair claim settlement practices.

176. Liberty Mutual's conduct in handling Plaintiffs' homeowners and automobile claims violates multiple provisions of West Virginia's insurance code and administrative regulations.

177. West Virginia Code § 33-11-4(9), part of the West Virginia Unfair Trade Practices Act, prohibits unfair claim settlement practices. The statute provides that "[n]o person shall commit or perform with such frequency as to indicate a general business practice" any of fifteen enumerated unfair claim settlement practices.

178. Liberty Mutual has committed the following violations of W. Va. Code § 33-11-4(9) with such frequency as to indicate a general business practice:

a. **Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue** in violation of § 33-11-4(9)(a). Liberty Mutual misrepresented that the CCC ONE Market Valuation Reports constituted objective, independent assessments of actual cash value when, in fact, these reports were generated based on parameters and inputs provided by Liberty Mutual and were explicitly prepared for Liberty Mutual's exclusive use, not as neutral market valuations.

b. **Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies** in violation of § 33-11-4(9)(b). Despite receiving Plaintiffs' letter of representation on June 16, 2025, and multiple subsequent demand letters dated July 11, 2025, July 15, 2025, July 16, 2025, July 24, 2025, July 25, 2025, and September 7, 2025, Liberty Mutual failed to acknowledge or respond to counsel's communications, failed to provide requested documentation, and failed to provide substantive responses regarding coverage, investigation results, or valuation methodologies.

c. **Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies** in violation of § 33-11-4(9)(c). Liberty Mutual's systematic reliance on photo-based Snapsheet estimates without physical vehicle inspections, its failure to conduct any investigation whatsoever of Plaintiffs' personal property losses, and its outsourcing of critical claims functions to vendors whose financial interests are aligned with reducing claim payments demonstrate the absence of reasonable investigation standards.

d. **Refusing to pay claims without conducting a reasonable investigation based upon all available information** in violation of § 33-11-4(9)(d). Liberty Mutual paid minimal amounts on the automobile claims ($212.67 for the Escalade, $398.56 for the Silverado, $483.00 initially for the Terrain) without conducting physical inspections to identify hidden damage, refused to investigate Plaintiffs' personal property losses despite receiving a detailed inventory, and issued low ball homeowners settlement offers without accounting for recoverable depreciation, building code upgrades, or numerous omitted items identified by Plaintiffs' public adjuster.

e. **Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed** in violation of § 33-11-4(9)(e). Despite Plaintiffs' timely reporting of all losses on April 19, 2025, and compliance with all policy requirements, Liberty Mutual has failed to affirm or deny coverage for the personal property losses, has failed to provide substantive responses to counsel's demands for coverage analysis, and has left multiple components of Plaintiffs' claims unresolved many months after the date of loss.

f. **Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear** in violation of § 33-11-4(9)(f). Liberty Mutual acknowledged that the April 19, 2025, tornado

losses were covered under Plaintiffs' homeowners and automobile policies, yet made substantially inadequate settlement offers for homeowners structural damage when the actual replacement cost was $160,126.17, and made comparably inadequate settlement offers for the plaintiffs automobile claims using vendor platforms designed to unfairly reduce payments and increase Liberty Mutual's corporate wealth.

g. **Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recoverable** in violation of § 33-11-4(9)(g). Liberty Mutual's inadequate settlement offers compared to the documented value of the plaintiff's claims represents a significant attempt at underpayment, demonstrating that Liberty Mutual compelled Plaintiffs to retain counsel and ultimately file this lawsuit to recover amounts that should have been paid promptly upon reasonable investigation.

h. **Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement** in violation of § 33-11-4(9)(n). Despite multiple written demands from counsel pursuant to § 33-11-4(9)(n), Liberty Mutual refused to provide explanations for its settlement offers, refused to disclose the identities of Snapsheet estimators or provide their estimates, refused to provide complete claim file documentation, claimed that valuation methodologies were "proprietary," and failed to provide any substantive written justification for its undervaluations.

179. In addition to violating the statutory provisions of W. Va. Code § 33-11-4(9), Liberty Mutual violated multiple provisions of West Virginia Insurance Regulations, Title 114, Series 14, which establish detailed standards for claims handling.

180. Liberty Mutual violated W. Va. CSR § 114-14-6.2, which provides: "Every insurer shall promptly conduct and diligently pursue a thorough, fair and objective investigation and may not unreasonably delay resolution by persisting in seeking information not reasonably required for or material to the resolution of a claim dispute." Liberty Mutual failed to conduct thorough, fair, and objective investigations by: (a) relying on photo-based estimates without physical vehicle inspections; (b) conducting no investigation whatsoever of personal property losses; (c) failing to account for hidden damage, building code requirements, and recoverable depreciation; and (d) outsourcing critical investigation functions to vendors whose financial interests conflict with conducting objective investigations.

181. Liberty Mutual violated W. Va. CSR § 114-14-4, which requires adjusters to comply with all applicable laws. The adjusters handling Plaintiffs' claims, including those employed directly by Liberty Mutual and those operating through vendor defendants Snapsheet, and CCC failed to comply with West Virginia's vehicle valuation requirements, failed to provide reasonable explanations as required by statute, and failed to conduct investigations consistent with West Virginia regulatory standards.

182. Liberty Mutual violated West Virginia's vehicle valuation requirements, including W. Va. CSR § 114-14-7 and West Virginia Informational Letter No. 55 issued by the West Virginia Insurance Commissioner. These regulations establish specific requirements for the valuation of total loss vehicles and prohibit certain improper practices.

183. West Virginia Informational Letter No. 55, issued in September 1988, specifically addresses "Deductions From Total Loss Auto Claims/Average Retail Condition." The Informational Letter states: "It has come to the attention of the West Virginia Insurance Commission that a number of insurers are routinely deducting amounts from total loss automobile claims for what is variously called a 'reconditioning fee,' a 'clean-up charge,' 'clean and shampoo charge,' etc."

184. Informational Letter No. 55 requires that insurers: (1) use the most recent publication of an "Official Used Car Guide" approved by the Commissioner and uniformly and regularly used by the company; (2) support any deviation downward from the guide's retail valuation with documentation that gives detailed information about the vehicle's condition; (3) ensure that any deductions are measurable, discernible, itemized, and specified concerning dollar amount, and that they are appropriate in amount; and (4) provide a reasonable written explanation to the concerned parties when settlement offers are made, specifying the dollar amount of the base figure,

identifying the actual source, and identifying and explaining any additions or subtractions from the base dollar figure.

185. Liberty Mutual violated these valuation requirements by: (a) applying arbitrary condition adjustments totaling $1,410.00 to the 2018 Chevrolet Traverse for components all rated as "NORMAL WEAR" without measurable, discernible, itemized support; (b) applying a condition adjustment of $578.00 to the 2014 Fiat 500L based on seats being "wet with debris" and "normal wear components" without proper documentation or justification; (c) using CCC valuation reports that explicitly disclaim reliance by anyone other than Liberty Mutual, thereby preventing meaningful review of the valuation methodology; (d) failing to provide reasonable written explanations of the basis for the valuations despite multiple demands from counsel; and (e) refusing to disclose the comparable vehicle selection criteria, adjustment matrices, and pricing parameters used to generate the valuations.

186. Liberty Mutual violated W. Va. CSR § 114-14-7.3(c), which provides that "[i]f the insurer intends to exercise its rights to inspect damages prior to repair, it has seven (7) working days from the date of receipt of notice of loss to inspect the insured's damaged motor vehicle at a place and time reasonably convenient to the insured. In addition, negotiations shall commence and a good faith offer of settlement shall be made within the aforesaid seven (7) day period."

187. Liberty Mutual failed to comply with the seven-day inspection requirement by: (a) failing to conduct physical inspections of the damaged vehicles within seven working days of notice of loss; (b) failing to make good faith settlement offers within seven working days; and (c) systematically relying on Snapsheet's photo-based estimates in lieu of timely physical inspections, thereby circumventing the regulatory requirement for prompt inspection and settlement negotiations.

188. Liberty Mutual violated W. Va. CSR § 114-14-7.5**,** which provides: "If any element of a physical damage claim remains unresolved more than fifteen (15) working days from the date of receipt of proofs of loss by the insurer, the insurer shall provide the insured with a written explanation of the specific reasons for the delay in the claim settlement unless reasonable grounds exist to suspect fraud or arson. An updated letter of explanation shall be sent every thirty (30) calendar days thereafter until all elements of the claim are either honored or rejected."

189. Liberty Mutual failed to provide written explanations for delays in claim settlement even though multiple elements of Plaintiffs' claims remained unresolved for months after the April 19, 2025 date of loss. The personal property component of the homeowners claim has never been investigated or adjusted. The automobile claims were subjected to prolonged disputes over valuation methodologies. No updated letters of explanation were provided every thirty calendar days as required by regulation. Instead, Liberty Mutual threatened to close claims for alleged "no communication" while ignoring legitimate correspondence from Plaintiffs' counsel.

190. The violations alleged herein were not isolated incidents or individual claim handling errors. Rather, Liberty Mutual committed these violations "with such frequency as to indicate a general business practice" as required by W. Va. Code § 33-11-4(9).

191. Evidence that Liberty Mutual's violations constitute a general business practice includes: (a) Liberty Mutual's systematic contractual relationships with vendor defendants Snapsheet, CCC, Allcat, and Claim Assist, whose business models and technologies are specifically designed to reduce claim payments across thousands of claims; (b) Snapsheet's marketing materials promising "15-20% Indemnity Savings" on average, demonstrating that the systematic undervaluation is not unique to Plaintiffs but affects all policyholders whose claims are processed through Snapsheet; (c) CCC's standard practice of generating Market Valuation Reports that are prepared exclusively

for insurance carriers and explicitly disclaim reliance by any other party, demonstrating systematic information asymmetry across all total loss valuations; (d) Claim Assist's AI-driven claims assignment platform that services six of the top ten property and casualty insurance carriers and operates through a network of more than 2,000 employees and 17,000 contractors, demonstrating the scale and systematic nature of the claims processing scheme; (e) the pattern of violations across multiple distinct claims in this case—five separate automobile claims and one homeowners claim—all demonstrating the same systematic undervaluation practices, refusal to provide documentation, and concealment of valuation methodologies; (f) Liberty Mutual's blanket refusal to respond to counsel's communications and blanket assertion that valuation methodologies are "proprietary," demonstrating a corporate policy rather than individual adjuster decisions; and (g) the coordinated nature of the undervaluation scheme involving multiple vendor defendants operating through integrated technology platforms with shared financial incentives to reduce claim payments.

192. W. Va. Code R. § 114-14-6.15, which prohibits "compensation based upon claim denials," and supports a systemic pattern of unfair practices.

193. Liberty Mutual’s bonus structure incentivizes reducing claims payments and reducing the cost of investigating claims by tying bonuses for the claim department to corporate profitability, further evidencing that Liberty Mutual's violations constitute a general business practice.

194. Liberty Mutual’s bonus structure ties employee compensation to reducing claim payment and investigation costs directly encouraging lowball offers and rushed evaluations.

195. Liberty Mutual does not train its employees to be mindful of the potential conflict of interest that is created by a bonus structure that rewards reducing claim payment and paying less money to investigate claims.

196. Liberty Mutual's practices affect consumers beyond Plaintiffs. The same vendor relationships, valuation methodologies, software platforms, and financial incentive structures are applied systematically to West Virginia policyholders throughout the state. Any policyholder whose automobile claim is processed through Snapsheet's virtual appraisal system is subjected to the same 15-20% reduction target. Any policyholder whose total loss claim is valued using CCC's Market Valuation Reports is subjected to the same predetermined adjustment formulas and insurer-controlled parameters. Any policyholder whose property claim is adjusted through Allcat or Claim Assist is subjected to the same AI-driven claims processing designed to reduce payments.

197. The systematic and widespread nature of Liberty Mutual's practices is further evidenced by the fact that Liberty Mutual has adopted these vendor relationships and technologies as its standard operating procedures rather than as isolated cost-saving measures for specific claims. Liberty Mutual's entire claims processing infrastructure is built around vendor platforms whose express purpose is to reduce indemnity payments, demonstrating that the violations are not aberrational but rather reflect Liberty Mutual's general business practice.

### H. Damages and Ongoing Harm

198. Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

199. As a direct and proximate result of Defendants' conduct alleged herein, Plaintiffs have suffered substantial and continuing economic and personal damages.

200. Plaintiffs have suffered economic damages including: (a) undervaluation of the homeowners claim, representing the difference between Liberty Mutual's offer and the documented replacement cost of $160,126.17; (b) complete non-payment of personal property losses totaling at least $11,184.87; (c) systematic undervaluation of automobile claims; and (d) failure to pay undisputed policy proceeds; (e) substantial litigation costs and expenses for

independent appraisers, public adjusters, mitigation contractors, and legal representation necessitated by Liberty Mutual's bad faith; and (f) other economic consequential economic loss such as out of pocket expense for necessary repair and maintenance to the Plaintiffs' home.

197. Plaintiffs have suffered consequential damages including: ongoing inability to complete necessary repairs to restore their home; inability to replace essential household items, furnishings, and systems; loss of use of vehicles due to undervalued total loss valuation; displacement from portions of the home due to unrepaired water damage; and ongoing electrical system malfunctions creating safety hazards including inoperable GFI outlets and no functioning alarm system.

198. Plaintiffs have suffered severe emotional distress, mental anguish, anxiety, anger, frustration, and a profound sense of betrayal.

199. The Plaintiffs' damages include the stress of dealing with insurance claim disputes while attempting to recover from a devastating natural disaster, the anxiety of living in a damaged home with continuing safety concerns, the frustration of navigating a claims system designed to deny full benefits, and the psychological trauma inflicted on Plaintiffs' children who witnessed their mother's visible distress and emotional breakdown.

200. Plaintiffs continue to suffer ongoing harm as their claims remain unresolved or inadequately resolved more than eight months after the April 19, 2025, loss.

201. Plaintiffs experience continued financial hardship from their inability to repair their home and properly replace their vehicles.

202. Plaintiffs continue to endure the additional stress and expense of pursuing litigation to obtain insurance benefits that Liberty Mutual should have paid promptly and in good faith.

203. Plaintiffs have suffered aggravation and inconvenience from countless hours spent documenting losses, photographing damage, communicating with multiple Liberty Mutual

adjusters and vendor personnel, hiring and coordinating with public adjusters and repair contractors, and ultimately retaining legal counsel to pursue remedies that should have been unnecessary.

204. Plaintiffs have suffered or face imminent risk of damage to their credit and financial standing and other financial obligations are affected by Liberty Mutual's non-payment or grossly delayed payment of insurance benefits.

205. Liberty Mutual's conduct was willful, wanton, malicious, and in reckless and conscious disregard of Plaintiffs' rights.

206. Liberty Mutual knew that Plaintiffs' claims were covered, knew its offers were grossly inadequate, deliberately partnered with vendors designed to reduce payments systematically concealed valuation methodologies.

207. Liberty Mutual ignored plaintiff’s counsel's communications and engaged in improper contacts to coerce inadequate settlements.

208. Liberty Mutual’s conduct warrants punitive damages to punish Liberty Mutual and deter similar systematic schemes to defraud West Virginia policyholders.

**COUNT I - BREACH OF CONTRACT (Against Liberty Mutual)**

209. Plaintiffs incorporate by reference all preceding paragraphs and allegations as if fully set forth herein.

210. Plaintiffs paid Liberty Mutual valuable consideration for insurance coverage in the form of insurance premiums under homeowners Policy No. H37-281-587442-7048 and automobile Policy No. AOV-281-737768-70 4 5.

211. In consideration of said premiums, Liberty Mutual issued Plaintiffs the homeowners policy and the automobile policy.

212. The homeowners policy and automobile policy constitute valid and enforceable contracts for insurance coverage which were in full force and effect on April 19, 2025.

213. On or about April 19, 2025, Plaintiffs suffered covered losses, as those terms are defined, under both the homeowners policy and the automobile policy when a tornado and severe weather event damaged their home and five vehicles.

214. Plaintiffs complied with all material terms and conditions of both policies, including timely notice, cooperation with investigation, submission of required documentation, and participation in the appraisal process when invoked by Liberty Mutual.

215. Liberty Mutual failed to timely provide the full value of the insurance coverage that it contracted for with Plaintiffs and is, therefore, in breach of both the homeowners policy and the automobile policy.

216. In addition, Liberty Mutual has breached the policies as follows:

a. Relying on vendor valuations that were systematically and improperly designed to undervalue losses through Snapsheet's photo-based estimates, CCC's predetermined adjustment formulas, and Claim Assist's AI-driven claims processing designed to reduce claim payments;

b. Failing to conduct adequate investigation by refusing to perform physical vehicle inspections, conducting no investigation whatsoever of personal property losses, and outsourcing critical claims functions to vendors with conflicts of interest;

c. Failing to pay for all structural damage to the home when the documented replacement cost was $160,126.17, resulting in an attempt at massive underpayment;

d. Failing to investigate or pay the personal property claim totaling at least $11,184.87, despite Coverage C providing $562,580 in coverage;

e. Undervaluing total loss vehicles through improper comparable selection, arbitrary condition adjustments, and predetermined reduction targets;

f. Undervaluing repairable vehicle damage through photo-only estimates incapable of detecting non-visible damage, resulting in minimal initial payments of $212.67, $398.56, and $483.00 that required multiple supplements and disputes.

g. Failing to pay undisputed policy proceeds due and owing under the policies of insurance.

217. As a direct and proximate result of the acts alleged in this count of the Complaint, Plaintiffs were damaged and injured including economic damages, consequential damages, loss of use, and ongoing inability to repair their home and replace their vehicles.

**WHEREFORE**, Plaintiffs demand judgment against Liberty Mutual for compensatory damages, the difference between amounts paid and amounts actually owed under the policies, consequential damages, pre-judgment and post-judgment interest, costs, attorneys' fees, and all further relief this Court deems just and proper.

**COUNT II - COMMON LAW BAD FAITH**
**(Hayseeds/Shamblin) (Against Liberty Mutual)**

218. Plaintiffs incorporate by reference all preceding paragraphs and allegations as if fully set forth herein.

219. Liberty Mutual had a duty to handle Plaintiffs' claims fairly and in good faith.

220. The duty of good faith arises from the special relationship between insurer and insured.

221. The duty of good faith and fair dealing is implied in every insurance contract under West Virginia law.

222. As the West Virginia Supreme Court of Appeals held in *Shamblin v. Nationwide Mutual Insurance Co.*, 183 W. Va. 585, 593, 396 S.E.2d 766, 774 (1990), an insurance company "must take into account the interest of its insured and give its insured's interest at least as much consideration as it gives its own interest."

223. An insurer may not place its own financial interests ahead of the insured's contractual rights to policy benefits.

224. The insurer's duty is to give equal consideration to the insured's interests—not to maximize corporate profits at the insured's expense.

225. Liberty Mutual breached its duty of good faith and fair dealing through the following conduct:

a. Unreasonable delay in investigating and paying Plaintiffs' claims, including failing to make full and complete substantive responses to multiple letters from counsel dated June 16, 2025, July 11, 2025, July 16, 2025, July 24, 2025, July 25, 2025, and September 7, 2025;

b. Failure to conduct a thorough, objective investigation by refusing to perform physical vehicle inspections, conducting no investigation whatsoever of personal property losses totaling at least $11,184.87, and outsourcing critical claims functions to vendors with conflicts of interest;

c. Relying on vendor-generated valuations that Liberty Mutual knew were systematically designed to reduce claim payments, including Snapsheet's photo-based estimates marketed to produce Indemnity Savings, CCC's predetermined adjustment formulas, and Claim Assist's AI-driven processing designed to reduce payments;

d. Refusing to pay undisputed amounts, offering only an inadequate settlement amount for homeowners structural damage when the documented replacement cost was $160,126.17, resulting in an attempt at massive underpayment;

e. Concealing critical claim information from Plaintiffs by refusing to disclose the identities of Snapsheet estimators, refusing to provide complete estimates and photographs from independent adjusters, and claiming that valuation methodologies were "proprietary" to prevent meaningful review;

f. Forcing Plaintiffs to hire legal counsel to recover benefits that were clearly owed under the policies, requiring Plaintiffs to retain a certified public adjuster, independent appraisers, and ultimately file this lawsuit to obtain payment;

g. Failing to give equal consideration to Plaintiffs' interests by systematically prioritizing Liberty Mutual's financial goal of reducing claim payments over the contractual obligation to fairly compensate Plaintiffs for covered losses;

h. Making claim decisions designed to benefit Liberty Mutual financially rather than to fairly compensate Plaintiffs, including utilizing vendor platforms whose business models depend on delivering cost savings to insurers at policyholders' expense.

226. Liberty Mutual's bad faith conduct includes the systematic use of vendors whose business model is specifically designed to reduce insurer payments.

227. Snapsheet explicitly markets its services by promising insurance companies 15-20% indemnity savings.

228. Liberty Mutual's decision to rely on such vendors demonstrates that Liberty Mutual prioritized reducing its own indemnity expenses over fairly investigating and paying Plaintiffs' claims.

229. Liberty Mutual's bad faith conduct further includes refusal to provide Plaintiffs with claim file materials that were essential to understanding and challenging Liberty Mutual's undervaluations.

230. Despite multiple written demands from counsel, Liberty Mutual refused to disclose the identities and contact information of Snapsheet estimators, refused to provide complete copies of estimates and photographs from independent adjusters, and refused to explain the basis for its valuation decisions—all while claiming such information was "proprietary."

231. Liberty Mutual's bad faith conduct further includes improper direct contact with Plaintiffs after retention of counsel. On August 1, 2025, and again on September 4, 2025, Liberty Mutual contacted Plaintiffs directly regarding claim matters in deliberate circumvention of counsel and in violation of professional conduct rules, demonstrating Liberty Mutual's intent to pressure Plaintiffs into accepting inadequate settlements without the advice and protection of counsel.

232. Liberty Mutual's bad faith conduct further includes threatening to and actually closing Plaintiffs' claims without payment.

233. For example, on July 25, 2025, Liberty Mutual threatened to close the 2018 Terrain claim for alleged "no communication" despite ongoing correspondence through counsel. Again, on September 11, 2025, a Liberty Mutual adjuster sent Plaintiffs a text message threatening to close

claims for "no communication," manufacturing false grounds for claim closure while ignoring legitimate communications from counsel.

234. Liberty Mutual's bad faith conduct further includes the systematic pattern of undervaluation across all of Plaintiffs' claims.

235. Liberty Mutual undervalued the homeowners structural damage and completely failed to investigate or pay personal property losses.

236. Liberty Mutual systematically undervalued all five automobile claims through photo-only estimates and CCC reports, and forced Plaintiffs into expensive appraisal and litigation processes to obtain benefits clearly owed.

237. Liberty Mutual's conduct was unreasonable and in reckless disregard of Plaintiffs' rights.

238. Liberty Mutual knew that Plaintiffs' claims were covered under the policies, knew that its vendor partners were designed to unfairly reduce payments, knew that photo-based estimates were incapable of detecting hidden damage, knew that its settlement offers were grossly inadequate compared to independent estimates, and yet persisted in refusing to conduct proper investigations, refusing to disclose valuation methodologies, and refusing to pay what was owed.

239. As a direct and proximate result of Liberty Mutual's bad faith, Plaintiffs suffered economic loss including underpayment of claims, out-of-pocket expenses for mitigation, public adjusters, independent appraisers, and legal fees, as well as loss of use of their home and vehicles.

240. Plaintiffs further suffered annoyance and inconvenience, emotional distress, mental anguish, anxiety, and a profound sense of betrayal from being forced to fight their own insurance company to obtain benefits they had paid premiums to secure.

241. Under West Virginia law, including the principles established in *Hayseeds, Inc. v. State Farm Fire & Casualty Co.*, 177 W. Va. 323, 352 S.E.2d 73 (1986), and *Shamblin v. Nationwide*

*Mutual Insurance Co.*, 183 W. Va. 585, 396 S.E.2d 766 (1990), Plaintiffs are entitled to enhanced damages and attorneys' fees for Liberty Mutual's bad faith conduct.

242. Whenever a policyholder substantially prevails in a property damage suit against its insurer, the insurer is liable for the insured's reasonable attorneys' fees, damages for net economic loss caused by delay in settlement, and damages for aggravation and inconvenience.

243. Plaintiffs have substantially prevailed or will substantially prevail in this action because Liberty Mutual's offers were grossly inadequate compared to the true value of covered losses, and Plaintiffs were forced to retain counsel and file this lawsuit to vindicate their rights under the insurance policies.

**WHEREFORE**, Plaintiffs demand judgment against Liberty Mutual for all damages available under West Virginia bad faith law, including compensatory damages, consequential damages, damages for aggravation and inconvenience, attorneys' fees, pre-judgment and post-judgment interest, punitive damages, costs, and all further relief this Court deems just and proper.

## COUNT III - VIOLATION OF WEST VIRGINIA UNFAIR TRADE PRACTICES ACT (UTPA) (Against Liberty Mutual)

244. Plaintiffs incorporate by reference all preceding paragraphs and allegations as if fully set forth herein.

245. W. Va. Code § 33-11-4(9) prohibits unfair claim settlement practices and provides that "[n]o person shall commit or perform with such frequency as to indicate a general business practice" any of fifteen enumerated unfair claim settlement practices.

246. Liberty Mutual, by and through its agents, servants, officers, adjusters, employees, and third-party vendors, violated the West Virginia Unfair Claims Settlement Practices Act, W. Va.

Code § 33-11-4(9), as well as the insurance regulations promulgated thereunder, including but not limited to the following:

a. Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue in violation of § 33-11-4(9)(a);

b. Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies in violation of § 33-11-4(9)(b);

c. Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies in violation of § 33-11-4(9)(c);

d. Refusing to pay claims without conducting a reasonable investigation based upon all available information in violation of § 33-11-4(9)(d);

e. Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed in violation of § 33-11-4(9)(e);

f. Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear in violation of § 33-11-4(9)(f);

g. Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately due in violation of § 33-11-4(9)(g);

h. Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement in violation of § 33-11-4(9)(n);

i. Attempting to coerce Plaintiffs into accepting unjust settlements through threats of claim closure and direct communications circumventing counsel;

j. Failing to negotiate in good faith and unreasonably refusing to acknowledge that Liberty Mutual was liable for the full value of Plaintiffs' claims for benefits; and/or

k. Other acts and omissions by Liberty Mutual.

247. To establish a cause of action under § 33-11-4(9), a plaintiff "must demonstrate that the insurer (1) violated the UTPA in the handling of the claimant's claim and (2) that the insurer committed violations of the UTPA with such frequency as to indicate a general business practice." *Holloman v. Nationwide Mut. Ins. Co*., 617 S.E.2d 816, 823 (W. Va. 2005).

248. "[E]ven though W.Va. Code § 33-11-4(9) requires more than a single isolated violation in order to show a general business practice, a claimant may produce sufficient evidence of this in a single claim." *Elmore v. State Farm Mut. Auto. Ins. Co*., 504 S.E.2d 893, 902 (W. Va. 1998). See

*Dodrill v. Nationwide Mut. Ins. Co*., 491 S.E.2d 1, 12-13 (W. Va. 1997) ("separate, discrete acts or omissions, each of which constitute violations of different sub-paragraphs of W. Va. Code § 33-11-4(9), may indeed demonstrate a 'general business practice' in the handling of a single claim, the focus of which would tend to show frequent and rather general disregard for the several proscriptions separately set out in the relevant statute.").

249. Liberty Mutual violated W. Va. Code § 33-11-4(9)(a) by misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue insofar as Liberty Mutual: (1) represented that CCC ONE Market Valuation Reports constituted objective, independent assessments of actual cash value when these reports were generated based on parameters and inputs provided by Liberty Mutual and explicitly prepared for Liberty Mutual's exclusive use; (2) represented that Snapsheet's photo-based estimates accurately assessed vehicle damage when Liberty Mutual knew that photo-based estimates systematically undervalue claims and cannot detect non-visible damage; (3) concealed the existence and nature of Liberty Mutual's business relationships with vendor defendants whose compensation depends on reducing claim payments; and (4) misrepresented the proprietary nature of claim file information to prevent Plaintiffs from understanding Liberty Mutual's valuation methodologies.

250. Liberty Mutual violated W. Va. Code § 33-11-4(9)(b) by failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies insofar as: (1) Liberty Mutual failed to fully and completely respond to Plaintiffs' letter of representation dated June 16, 2025; (2) Liberty Mutual failed to fully and complete respond to counsel's pertinent inquires dated July 11, 2025, July 15, 2025, July 16, 2025, July 24, 2025, July 25, 2025, and September 7, 2025; (3) Liberty Mutual refused to provide requested documentation including estimates, audits, photographs, and identification of Snapsheet estimators; (4) Liberty

Mutual refused to timely provide a certified copy of the insurance policy despite multiple demands; (5) Liberty Mutual threatened to close claims for alleged "no communication" while ignoring legitimate correspondence from counsel; and (6) Liberty Mutual otherwise generally failed to act reasonably promptly upon Plaintiffs' communications regarding their claims.

251. Liberty Mutual violated W. Va. Code § 33-11-4(9)(c) by failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies insofar as Liberty Mutual: (1) systematically relied on Snapsheet's photo-based estimates without conducting physical vehicle inspections to identify hidden damage; (2) conducted no investigation whatsoever of Plaintiffs' personal property losses totaling at least $11,184.87; (3) outsourced critical investigation functions to vendor defendants whose business models and financial incentives are aligned with reducing claim payments rather than fairly investigating claims; (4) utilized vendor platforms marketed to produce indemnity savings through systematic undervaluation; (5) failed to conduct room-by-room assessments of homeowners structural damage consistent with industry standards; (6) used automated pricing databases and predetermined adjustment formulas rather than actual assessments of specific materials, finishes, and systems requiring repair; and (7) instituted arbitrary procedures that prevented meaningful investigation and adjustment of supplemental damages.

252. Liberty Mutual violated W. Va. Code § 33-11-4(9)(d) by refusing to pay claims without conducting a reasonable investigation based upon all available information insofar as: (1) Liberty Mutual undervalued the homeowners structural damage when the documented replacement cost was $160,126.17; (2) Liberty Mutual made no effort to investigate or pay personal property losses; (3) Liberty Mutual paid minimal amounts on automobile claims ($212.67 for Escalade, $398.56 for Silverado, $483.00 initially for Terrain) without physical inspections; (4) Liberty Mutual

systematically undervalued the total loss value of the plaintiffs' vehicles using CCC's Market Valuation Reports; (5) Liberty Mutual shifted the burden of investigation onto Plaintiffs rather than conducting its own reasonable investigation; and (6) Liberty Mutual refused to consider independent estimates and documentation provided by Plaintiffs demonstrating the inadequacy of Liberty Mutual's offers.

253. Liberty Mutual violated W. Va. Code § 33-11-4(9)(e) by failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed insofar as: (1) Plaintiffs timely reported all losses on April 19, 2025, and complied with all policy requirements; (2) Liberty Mutual has failed to affirm or deny coverage for personal property losses more than eight months after the date of loss; (3) Liberty Mutual has failed to provide substantive responses to counsel's demands for coverage analysis; and (4) multiple components of Plaintiffs' claims remain unresolved despite the passage of reasonable time for investigation and decision.

254. Liberty Mutual violated W. Va. Code § 33-11-4(9)(f) by not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear insofar as: (1) Liberty Mutual acknowledged that the April 19, 2025 tornado losses were covered under Plaintiffs' policies; (2) Liberty Mutual knew, based upon vendor marketing materials, that Snapsheet produces estimates that are systematically reduced by 15-20% to deliver indemnity savings; (3) Liberty Mutual deliberately utilized vendor platforms designed to reduce claim payments rather than fairly assess actual damages; (4) Liberty Mutual offered only $34,723.24 for homeowners damage when the replacement cost was $160,126.17; (5) Liberty Mutual systematically undervalued all five automobile claims through predetermined reduction formulas and arbitrary condition adjustments; and (6) Liberty Mutual knew its offers were substantially less than amounts actually owed but refused to pay fair settlements.

255. Liberty Mutual violated W. Va. Code § 33-11-4(9)(g) by compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately due insofar as: (1) Liberty Mutual's homeowners settlement offer of $34,723.24 compared to the documented replacement cost of $160,126.17 represents an underpayment of $125,402.93; (2) Liberty Mutual forced Plaintiffs to retain legal counsel to pursue benefits that were clearly owed; (3) Liberty Mutual forced Plaintiffs to hire a certified public adjuster at substantial expense to document the actual scope of homeowners damage; (4) Liberty Mutual invoked the appraisal clause on the 2018 Chevrolet Traverse to force Plaintiffs into expensive appraisal proceedings rather than paying what was owed; and (5) Liberty Mutual's systematic pattern of offering substantially less than amounts due compelled Plaintiffs to file this lawsuit.

256. Liberty Mutual violated W. Va. Code § 33-11-4(9)(n) by failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement insofar as: (1) despite multiple written demands from counsel, Liberty Mutual refused to explain the basis for its settlement offers; (2) Liberty Mutual refused to disclose the identities of Snapsheet estimators or provide their complete estimates; (3) Liberty Mutual refused to provide complete claim file documentation including estimates, audits, and photographs relied upon by adjusters; (4) Liberty Mutual claimed that valuation methodologies were "proprietary" to prevent disclosure; (5) Liberty Mutual failed to provide substantive written justification for its undervaluations; and (6) Liberty Mutual's concealment prevented Plaintiffs from understanding or effectively challenging the systematic undervaluation.

257. Plaintiffs have alleged "separate, discrete acts or omissions, each of which constitute violations of different sub-paragraphs of W. Va. Code § 33-11-4(9)." Dodrill, 491 S.E.2d at 12-13.

258. Liberty Mutual, by and through its agents, servants, officers, adjusters, employees, and vendor defendants, committed violations of the West Virginia Unfair Claims Settlement Practices Act and West Virginia insurance regulations with such frequency as to indicate a general business practice.

259. Evidence that Liberty Mutual's violations constitute a general business practice includes: (1) Liberty Mutual's systematic contractual relationships with vendor defendants Snapsheet, CCC, Allcat, and Claim Assist, whose business models and technologies are specifically designed to reduce claim payments across thousands of claims; (2) the pattern of violations across multiple distinct claims in this case, five separate automobile claims and one homeowners claim, all demonstrating the same systematic undervaluation practices, refusal to provide documentation, and concealment of valuation methodologies; (3) Snapsheet's marketing materials promising 15-20% Indemnity Savings on average, demonstrating that the systematic undervaluation affects all policyholders whose claims are processed through Snapsheet; (4) CCC's standard practice of generating Market Valuation Reports prepared exclusively for insurance carriers and explicitly disclaiming reliance by any other party; (5) Claim Assist's AI-driven claims assignment platform that services six of the top ten property and casualty carriers through a network of more than 2,000 employees and 17,000 contractors; (6) Liberty Mutual's blanket refusal to respond to counsel's communications and blanket assertion that valuation methodologies are "proprietary," demonstrating a corporate policy rather than individual adjuster decisions; and (7) the coordinated

nature of the undervaluation scheme involving multiple vendor defendants operating through integrated technology platforms with shared financial incentives to reduce claim payments.

260. In addition to violating W. Va. Code § 33-11-4(9), Liberty Mutual violated West Virginia Insurance Regulations, Title 114, Series 14, including: (1) W. Va. CSR § 114-14-6.2 requiring prompt, thorough, fair and objective investigation; (2) W. Va. CSR § 114-14-4 requiring adjusters to comply with all applicable laws; (3) W. Va. CSR § 114-14-7 establishing standards for automobile claims adjustment; (4) W. Va. CSR § 114-14-7.3(c) requiring seven-day inspection and good faith settlement offer; (5) W. Va. CSR § 114-14-7.5 requiring written explanations for delays exceeding fifteen working days; and (6) West Virginia Informational Letter No. 55 prohibiting arbitrary deductions and requiring measurable, discernible, itemized condition adjustments with reasonable written explanations.

261. Liberty Mutual's practices affect consumers beyond Plaintiffs. The same vendor relationships, valuation methodologies, software platforms, and financial incentive structures are applied systematically to West Virginia policyholders throughout the state, demonstrating that Liberty Mutual's violations are not isolated but constitute a general business practice.

262. As a direct and proximate result of the acts alleged in this count of the Complaint, Plaintiffs were damaged and injured including economic damages, consequential damages, emotional distress, aggravation and inconvenience, loss of use, and ongoing inability to repair their home and replace their vehicles.

**WHEREFORE**, Plaintiffs demand judgment against Liberty Mutual for compensatory damages, consequential damages, interest, costs, and all relief available under W. Va. Code § 33-11-1, et seq., including but not limited to damages for economic loss, annoyance and

inconvenience, attorneys' fees where applicable, pre-judgment and post-judgment interest, and all further relief this Court deems just and proper.

**COUNT IV - CIVIL CONSPIRACY**
**(Against CCC, Snapsheet, Allcat, Claim Assist, and Liberty Mutual)**

263. Plaintiffs incorporate by reference all preceding paragraphs and allegations as if fully set forth herein.

264. Liberty Mutual, CCC, Snapsheet, Allcat, and Claim Assist, by and through their concerted action described hereinabove, acted in concert, pursuant to a common plan or agreement, to accomplish an unlawful purpose and/or to accomplish some purpose, not in itself unlawful, by unlawful means.

265. Specifically, the Defendants conspired to systematically undervalue and underpay Plaintiffs' property and vehicle claims and reduce the amounts paid in violation of West Virginia insurance law, including the West Virginia Unfair Trade Practices Act and West Virginia Insurance Regulations, to increase Liberty Mutual's corporate profit while enriching the vendor defendants through ongoing business relationships dependent on delivering cost savings to Liberty Mutual.

266. The vendor defendants, CCC, Snapsheet, Allcat, and Claim Assist, designed, marketed, and provided valuation tools and services specifically intended to reduce insurer claim payments.

267. Liberty Mutual knowingly adopted and implemented these tools for that express purpose, creating a coordinated scheme to deprive insureds of full benefits owed under insurance policies.

268. Evidence of the conspiracy includes Snapsheet's marketing materials explicitly promising insurance carriers "15-20% Indemnity Savings" on average, demonstrating that the vendor defendants' business model depends entirely on helping insurers reduce payments to policyholders.

269. Liberty Mutual has invested in Snapsheet through its venture capital subsidiary and entered into business partnerships with all vendor defendants, creating financial interdependence and shared economic interest in reducing claim payments.

270. The conspiracy is further evidence by the following Scheme: an insured, including the plaintiffs, suffer the total loss of an insured vehicle by collision, hail, or some other cause. The insured submits a claim for indemnity to their insurance company, Defendant Liberty Mutual, under their automotive insurance policy. Liberty Mutual loads the insured's claims data into the software portal its contracted Defendant CCC Intelligent Solutions, Inc. to provide. With the CCC Intelligent Solutions, Inc.'s knowledge, guidance, assistance, and cooperation, Liberty Mutual uses the software portal to generate a Market Value Report ("MVR") that states a monetary value for the loss vehicle. This value, which each Liberty Mutual misrepresents as actual cash value or "ACV" for the loss vehicle, forms the basis of what Liberty Mutual claims is owed its insured in payment of the total loss claim. Both Liberty Mutual and CCC Intelligent Solutions know the MVR substantially and materially understates the loss vehicle's value so that Liberty Mutual may resolve the claim for a lesser amount than it owes its insureds, and thereby reduce its indemnity losses. With CCC Intelligent Solutions assistance, Liberty Mutual purposefully use MVRs to induce insureds to accept lesser settlement amounts to their detriment. The result is that Liberty Mutual systematically and pervasively underpay claims to their insureds' detriment. CCC Intelligent Solutions is fully aware of Liberty Mutual's intended outcome, purposeful use of their MVR software to achieve that outcome, and the effect the Scheme has on West Virginia insureds. But, nonetheless, Liberty Mutual assists their contracted insurance company, Liberty Mutual, in customizing their software for the purpose of underpaying automobile total loss claims, from which CCC Intelligent Solutions derive significant revenue. At all relevant times, the Scheme is

hidden from plain view. Insureds have no way to know the ways in which the MVR software "rigs the game" against them from the start of their claim.

271. Valuation Defendants Snapsheet and CCC Intelligent Solutions are knowing and willing participants in a scheme to systematically reduce claim payment and increase Liberty Mutual's revenue.

272. The Defendants Snapsheet and CCC Intelligent Solutions are knowing, willing, and essential

participants.

273. At all relevant times, Defendants Snapsheet and CCC Intelligent Solutions are direct actors-knowing and willful co-conspirators.

274. Defendants Snapsheet and CCC Intelligent Solutions create, design, and provide Liberty Mutual with the software tools, customization capabilities, and guidance to underpay its insureds.

275. Defendants Snapsheet and CCC Intelligent Solutions conspire with Liberty Mutual by designing and modifying software in a manner that allows Liberty Mutual to improperly and unfairly reduce their indemnity losses at the insureds' detriment.

276. The conspiracy is further evidenced by the systematic deployment of these undervaluation tools across all of Plaintiffs' claims, five separate automobile claims and one homeowners claim, demonstrating coordinated implementation of the common plan rather than isolated claim handling decisions.

277. The coordination between Liberty Mutual and the vendor defendants is evidenced by: dual email addresses for vendor personnel (both @libertymutual.com and vendor company addresses); vendor personnel acting as Liberty Mutual adjusters with access to Liberty Mutual's claims management systems; and claim notes documenting that Liberty Mutual consulted with vendors

on "how they want the claim handled," demonstrating joint decision-making and shared control over claim outcomes.

278. The conspiracy further involved systematic concealment of valuation methodologies, adjuster materials, and software specifications from insureds to prevent detection of the scheme. Liberty Mutual and the vendor defendants refused to disclose Snapsheet estimator identities, refused to provide complete vendor estimates and documentation, and claimed valuation methodologies were "proprietary" to obstruct Plaintiffs' ability to understand and challenge the undervaluations.

279. Collectively, Liberty Mutual, Allcat Claims Service, LP, Claim Assist Solutions, and Claim Assist Technologies, LLC combined and agreed to use vendor-based inspection, estimation, automation, and scoring systems to systematically reduce claim payments through predetermined processes, withheld documentation, and deployed incentive structures favoring low estimates and rapid closure.

280. Liberty Mutual routed Plaintiffs' claims to these entities for inspection, estimation, adjustment, and valuation through vendor-controlled workflows, including assignment of independent adjusters affiliated with Allcat (including Shermica J. Porter, Daniel Scott Weakly, and Shawn Patrick McKnight) and reliance on AI-driven claim assignment and automated "quality review" systems provided by Claim Assist that score, filter, and distribute work to adjusters based on carrier-preferred performance metrics and "cost per claim savings."

281. These systems create financial incentives for adjusters to process claims quickly and write low estimates to preserve high scores and maintain future assignments, while discouraging accurate valuations and full payment of covered losses.

282. In furtherance of the conspiracy, Defendants generated and relied upon estimates, audits, photographs, pricing databases, software parameters, and valuation criteria, including Snapsheet photo estimates, Cotality Data Driven pricing and ITEL programs, and CCC ONE total-loss valuation matrices, yet withheld and refused to disclose complete materials and key valuation inputs, impairing Plaintiffs' ability to challenge the determinations and resulting in reduced benefits, improper claim handling, and consequential damages.

283. These acts were taken in furtherance of an unlawful objective, unfairly reducing claim payment to increase Liberty Mutual and its vendor partner's wealth, and caused Plaintiffs to suffer reduced benefits, delay, and other consequential damages.

284. Liberty Mutual conspired and acted in concert with its claims processing vendors, Allcat, Claim Assist, and other vendor partners including Snapsheet and CCC Intelligent Solutions, to implement a coordinated scheme to delay, control, and systematically undervalue Plaintiffs' covered property and automobile losses in order to reduce claim payments and maximize insurer profit.

285. The purpose of the conspiracy was unlawful: to deprive insureds of full benefits through improper valuation practices, deceptive claim handling, and unfair claim settlement practices in violation of West Virginia law, including W. Va. Code § 33-11-4(9) and West Virginia Insurance Regulations.

286. Defendants committed overt acts in furtherance of the conspiracy, including: designing undervaluation software and AI-driven platforms marketed to reduce claim payments by 15-20%; customizing valuation matrices, databases, and adjustment formulas to produce systematically reduced valuations; generating artificially low estimates and valuations for Plaintiffs' homeowners

and automobile claims; refusing to disclose methodologies and maintaining information asymmetry; and coordinating on claim positions to resist Plaintiffs' demands for fair payment.

287. As a direct and proximate result of the conspiracy, Plaintiffs suffered damages as set forth herein, including undervaluation of homeowners structural damage, complete non-payment of personal property losses, systematic undervaluation of all five automobile claims, and consequential damages including loss of use, emotional distress, and expenses for independent experts and legal counsel.

288. The conspiracy was willful and malicious, undertaken with knowledge that the coordinated scheme would deprive West Virginia policyholders of benefits owed under insurance contracts, warranting an award of punitive damages to punish Defendants and deter similar conduct.

**WHEREFORE**, Plaintiffs demand judgment against CCC, Snapsheet, Allcat, Claim Assist, and Liberty Mutual, jointly and severally, for compensatory damages, punitive damages, costs, interest, and all further relief this Court deems just and proper.

## COUNT V - FRAUD/FRAUDULENT MISREPRESENTATION
## (Against CCC, Snapsheet, Allcat, Claim Assist, and Liberty Mutual)

289. Plaintiffs incorporate by reference all preceding paragraphs and allegations as if fully set forth herein.

290. Defendants CCC, Snapsheet, Allcat, Claim Assist, and Liberty Mutual made material misrepresentations of fact to Plaintiffs, both explicitly and implicitly, including:

a. That the vendor-generated estimates and valuations were fair, objective, accurate, and reflective of actual market value and replacement cost;

b. That Liberty Mutual conducted thorough and objective investigations of Plaintiffs' claims;

c. That the amounts offered represented full payment of benefits owed under the policies;

d. That the valuation methodologies complied with West Virginia law and industry standards; and

e. That Liberty Mutual was acting in good faith in handling Plaintiffs' claims.

291. These representations were false. The estimates were generated by systems specifically designed to undervalue claims. The investigations were inadequate and one-sided, with no physical vehicle inspections and no investigation of personal property losses. The offers were substantially less than the amounts owed for the homeowners claim. The methodologies violated West Virginia law by utilizing predetermined reduction formulas and concealing valuation processes. Liberty Mutual was acting in bad faith to reduce its financial obligations rather than fairly compensating Plaintiffs.

292. Defendants knew these representations were false or made them with reckless disregard for their truth.

293. Liberty Mutual and the vendor defendants knew the valuation tools were designed to reduce payments.

294. In fact, Snapsheet explicitly markets its services will produce "15-20% Indemnity Savings."

295. Liberty Mutual, Snapsheet and CCC each knew the estimates were artificially low because the systems were calibrated to produce reduced valuations.

296. Liberty Mutual knew the methodologies were improper and deliberately concealed this information by refusing to disclose estimator identities, refusing to provide complete vendor documentation, and claiming valuation processes were "proprietary."

297. The representations were made with the intent that Plaintiffs rely upon them. Defendants intended Plaintiffs to accept the low valuations and settlement offers without question, believing them to be fair and accurate assessments by their insurer and professional estimation services.

298. Plaintiffs justifiably relied on the representations. They reasonably believed their insurer would treat them fairly, that vendor-generated "professional" estimates would be accurate, and that Liberty Mutual's settlement offers reflected good faith evaluations especially given the technical nature of property valuation, the information asymmetry favoring defendants, and the fiduciary nature of the insurance relationship.

299. Plaintiffs' detrimental reliance on defendants misstatements of fact resulted in delay in retaining counsel, hiring experts and other consequential loss.

300. For example, Liberty Mutual's field adjuster Shawn McKnight represented to Plaintiffs during his April 28, 2025 inspection of their home that a full roof replacement was warranted and necessary. McKnight told Plaintiffs and their contractor that he would finalize the report with photographs and submit it to Liberty Mutual, confirming that full roof replacement had been approved. Yet Liberty Mutual's subsequent estimate made no provision for full roof replacement, revealing that McKnight's representations—whether unauthorized or deliberately misleading—created false expectations that Liberty Mutual then failed to honor.

301. Plaintiffs detrimentally relied upon this false representation and incurred substantial financial cost and expense.

302. Plaintiffs suffered damages as a direct result of their reliance, including underpayment of homeowners structural damage, complete non-payment of personal property losses, systematic undervaluation of automobile claims, and expenses incurred to retain public adjusters, independent appraisers, and legal counsel to challenge the fraudulent valuations.

**WHEREFORE**, Plaintiffs demand judgment against CCC, Snapsheet, Allcat, Claim Assist, and Liberty Mutual, jointly and severally, for compensatory damages, punitive damages, costs, interest, and all further relief this Court deems just and proper.

**COUNT VI - UNJUST ENRICHMENT**
**(Against CCC, Snapsheet, Allcat, Claim Assist) (Alternative Pleading)**

303. Plaintiffs incorporate by reference all preceding paragraphs and allegations as if fully set forth herein.

304. This count is pled in the alternative to Plaintiffs' contract and fraud claims against the vendor defendants, as permitted under West Virginia pleading rules.

305. Defendants CCC, Snapsheet, Allcat, and Claim Assist (collectively, the "Vendor Defendants") received substantial compensation and financial benefits from Liberty Mutual for providing valuation services, adjusting services, claims processing platforms, and estimation software in connection with Plaintiffs' homeowners and automobile claims.

306. The Vendor Defendants benefited financially from supplying products, services, and methodologies that systematically undervalued Plaintiffs' vehicles and property, thereby reducing claim payouts to Plaintiffs. Snapsheet's marketing materials explicitly promise insurance carriers "15-20% Indemnity Savings" on average. CCC generates Market Valuation Reports designed to produce systematically reduced valuations. Claim Assist provides AI-driven claims processing specifically calibrated to reduce payments to insureds. Allcat provides adjusting services that systematically undervalue property damage claims in partnership with insurance carriers.

307. The Vendor Defendants were unjustly enriched by profiting from a scheme that deprived Plaintiffs of full benefits owed under their insurance policies. The Vendor Defendants received payments from Liberty Mutual for services rendered in connection with Plaintiffs' claims, yet those services were designed to, and did, produce artificially reduced valuations that resulted in Liberty Mutual underpaying Plaintiffs on the homeowners structural damage claim, completely failing to pay personal property losses, and systematically undervaluing all five automobile claims.

308. It would be inequitable and unjust for the Vendor Defendants to retain the benefits they obtained through improper means. The Vendor Defendants profited from providing valuation tools and services that they knew were designed to reduce claim payments below the amounts actually owed to insureds, and they profited from concealing the methodologies and limitations of their systems from insureds who were thereby prevented from challenging the systematic undervaluations.

309. Plaintiffs conferred a benefit on the Vendor Defendants, albeit indirectly through Liberty Mutual's payment for services rendered in processing Plaintiffs' claims. The Vendor Defendants' compensation was derived from claims involving Plaintiffs' covered losses, and the Vendor Defendants provided their undervaluation services with respect to Plaintiffs' specific property and vehicles.

310. The Vendor Defendants' retention of the benefit is unjust because it was obtained by systematically defrauding insureds through the use of predetermined reduction formulas, improper comparable selection, arbitrary condition adjustments, concealed valuation matrices, and information asymmetry that prevented insureds from understanding or challenging the undervaluations.

311. Plaintiffs have no adequate remedy at law to prevent this unjust enrichment. The Vendor Defendants are not parties to the insurance contracts and thus cannot be held liable for breach of contract. The systematic nature of the undervaluation scheme makes calculation of precise damages difficult, and equitable relief in the form of restitution and disgorgement is necessary to prevent the Vendor Defendants from retaining ill-gotten profits from their participation in the fraudulent scheme.

312. Plaintiffs are entitled to restitution and disgorgement of profits the Vendor Defendants obtained through their participation in the scheme to undervalue claims, including all fees and compensation received from Liberty Mutual for services rendered in connection with Plaintiffs' homeowners and automobile claims.

**WHEREFORE**, Plaintiffs demand restitution and disgorgement from CCC, Snapsheet, Allcat, and Claim Assist, together with costs, interest, and all further equitable relief this Court deems just and proper.

**COUNT VII - NEGLIGENCE/NEGLIGENT MISREPRESENTATION**
**(Against CCC, Snapsheet, Allcat, Claim Assist)**

313. Plaintiffs incorporate by reference all preceding paragraphs and allegations as if fully set forth herein.

314. Defendants CCC, Snapsheet, Allcat, and Claim Assist supplied vehicle and property valuation information, damage estimates, and assessment reports to Liberty Mutual for use in determining claim payments to Plaintiffs. These vendor defendants knew or should have known that their valuations and estimates would be provided to Plaintiffs and would directly impact the amounts Plaintiffs received under their insurance policies.

315. The Vendor Defendants owed Plaintiffs a duty to use reasonable care in generating and supplying valuations and estimates. They had a duty not to generate valuations that were systematically distorted, misleading, or designed to undervalue claims. This duty arose from their voluntary undertaking to provide professional valuation and adjusting services, their knowledge that insureds would rely on their work product, their role as purported neutral experts in property and vehicle valuation, and the foreseeable harm to insureds from inaccurate or biased valuations.

316. The Vendor Defendants breached their duty of care by: using improper comparables; applying hidden adjustment matrices not disclosed to insureds; using artificial price deductions;

generating estimates from photos alone when physical inspection was required; employing methodologies designed to produce systematically low values rather than accurate market valuations; training estimators not to disclose quality issues with photographs; and failing to conduct independent, objective assessments. The vendor defendants' breach was negligent, careless, and reckless.

317. Plaintiffs suffered damages as a proximate result of the vendor defendants' negligence, including underpayment of claims, loss of use, emotional distress, and expenses for independent experts and legal counsel.

318. Alternatively, the vendor defendants made negligent misrepresentations by supplying false information to Liberty Mutual and Plaintiffs regarding property and vehicle valuations, knowing it would be relied upon in determining claim payments, without reasonable grounds for believing it to be accurate.

**WHEREFORE**, Plaintiffs demand judgment against CCC, Snapsheet, Allcat, and Claim Assist for compensatory damages, costs, interest, and all further relief this Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Edward Patrick Ryan Jr. and Tammy Lynn Ryan demand judgment against Defendants Liberty Mutual Insurance Company, Liberty Insurance Corporation, CCC Intelligent Solutions Inc., Bodyshopbids, Inc. d/b/a Snapsheet, Inc., Allcat Claims Service, LP, Claim Assist Solutions, and Claim Assist Technologies, LLC, jointly and severally, for the following:

a. Compensatory damages in an amount to be determined at trial, sufficient to fully compensate Plaintiffs for all economic losses including homeowners claim underpayment, personal property claim non-payment, automobile claim underpayments, and out-of-pocket expenses;

b. Consequential damages for loss of use, emotional distress, mental anguish, aggravation and inconvenience, and all other consequential harm;

c. Punitive damages in an amount sufficient to punish Defendants and deter similar conduct in the future, to be determined by the jury;

d. Attorneys' fees and costs as available under West Virginia law, including the Hayseeds rule for bad faith, statutory provisions under W. Va. Code § 33-11-1, et seq., and common law;

e. Pre-judgment interest on all amounts due and owing;

f. Post-judgment interest at the legal rate;

g. Costs of suit;

h. An order enjoining Defendants from continuing to use improper valuation practices and claim handling procedures that violate West Virginia law; and

i. Such other and further relief as the Court deems just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

EDWARD PATRICK RYAN JR. and
TAMMY LYNN RYAN,

By Counsel,

/s/ George N. Sidiropolis__________________
George N. Sidiropolis, Esq. (# 10391)
**THE INJURY RIGHTS LAW FIRM, PLLC**
1140 Main Street, 4th Floor
Wheeling, West Virginia 26003
Phone: (304) 233-7766
george@injuryrightsfirm.com

*Attorney for Plaintiffs*